**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

TORICO REAVES,
        *Defendant-Appellant.*

No. 06-5073

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:06-cr-00153)

Argued: November 2, 2007

Decided: January 8, 2008

Before WILLIAMS, Chief Judge, and WILKINSON
and MICHAEL, Circuit Judges.

Vacated by published opinion. Judge Michael wrote the opinion, in which Chief Judge Williams and Judge Wilkinson joined.

## COUNSEL

**ARGUED:** Martin Gregory Bahl, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Debra L. Dwyer, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, John H. Chun, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC

DEFENDER, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

MICHAEL, Circuit Judge:

The police stopped Torico Reaves's car based solely on an anonymous 911 call from a woman who said she had seen the driver participate in a transaction involving a sandwich bag and a gun. The transaction, the caller assumed, was a drug deal. The district court concluded that the tip was sufficiently reliable to provide the police with reasonable suspicion to make the stop. As a result, the evidence (a handgun and ammunition) seized during the stop was introduced at trial to convict Reaves of a gun crime, 18 U.S.C. § 922(g). Because the tip prompting the stop was not sufficiently corroborated in its assertion of illegal conduct, we hold that the stop violated the Fourth Amendment. We therefore vacate Reaves's conviction.

I.

The undisputed facts about the anonymous tip that led to the stop of Reaves's vehicle are as follows. On December 7, 2005, around 10:30 a.m., an anonymous female called a 911 operator in Anne Arundel County, Maryland, stating that she wanted "to report someone traveling in a car with a gun." S.J.A. 3. The caller described the driver as a black male and the car as a plum-colored S430 Mercedes with temporary tags. When the caller also reported that there were drugs in the car, the operator asked the caller whether she knew the "kind of drugs" involved. S.J.A. 4. The caller replied that she had been sitting in her car near a local bar and saw the driver of the Mercedes engage in a transaction involving "a bag of something . . . a big sandwich bag of stuff." S.J.A. 4. The caller also reported seeing a small gun with a black top as she witnessed the event. The caller did not know the driver of the Mercedes, and she twice emphasized that she "want[ed] to stay anonymous." S.J.A. 5. A heightened concern about remaining anonymous and not "get[ting] in any kind of trouble" led the caller to express the wish that the police not approach the driver by saying, "we heard you got a gun in your car." S.J.A. 5, 6.

When the anonymous caller contacted 911, she was following the Mercedes on Pioneer Drive in Anne Arundel County, not far from the Baltimore-Washington International Airport. The 911 operator immediately opened a line to the police dispatcher, passing on the tip and the route information received from the caller as she followed the Mercedes. The dispatcher, in turn, radioed officers on patrol in the area, initially alerting them that an anonymous caller had reported a drug transaction involving a black gun and that a male suspect was in the vicinity of Pioneer Drive and Reece Road, driving a plum-colored S430 Mercedes with temporary tags.

Detective Charles Jones heard the dispatcher's message and took up the hunt for the Mercedes. The detective was guided by information — passed through the 911 operator and the dispatcher — from the anonymous caller, who followed the Mercedes for several blocks and contemporaneously reported its location. The caller thus reported that the Mercedes left Pioneer Drive and turned north on Reece Road toward the intersection of Route 174 and 170; at the intersection the vehicle turned onto Route 170 in the direction of Baltimore. The caller, who was on the way to the market, reported that the Mercedes was still proceeding on Route 170 when she exited onto Route 100 toward her market destination.

Shortly thereafter, and approximately five minutes after the dispatcher's first message, Detective Jones spotted the plum-colored Mercedes and followed it for a short distance before conducting a traffic stop. The detective stopped the car solely on the basis of the dispatcher's message. (The stop did not occur in a high-crime area.) Detective Jones walked up to the Mercedes and identified himself. The driver, Torico Reaves, asked why he had been stopped. The detective advised Reaves that the police department had received a complaint that he "possibly [had] a handgun." J.A. 16. Reaves immediately raised his hands in the air and said, "I have a gun, man. I have a gun right here in my pocket. Don't shoot me." *Id.* Next, the detective ordered Reaves out of the vehicle, conducted a pat-down search, and placed him in handcuffs. During this process Detective Jones noticed a black handgun on the driver's seat. It turned out to be a loaded Beretta. When the Mercedes was searched, $2000 in currency was found in the back seat.

In a one-count indictment returned in the District of Maryland, the government charged Reaves with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g). Reaves filed a motion to suppress the evidence — gun, ammunition, currency, and his statements to Detective Jones — obtained as a result of the vehicle stop that had been triggered by the anonymous 911 call. Reaves asserted that the call did not provide the reasonable suspicion required to justify a forcible stop. The district court denied the motion, concluding that the call provided "self-authenticating detail," which was "a sufficient basis for the stop." J.A. 32, 39. At trial the evidence from the stop was the crux of the government's case, and the jury returned a guilty verdict. Reaves appeals the judgment, arguing that the district court erred in ruling that the police had reasonable suspicion to stop him. The facts leading to the stop were accepted by the district court as we have recounted them. Our review is therefore limited to *de novo* consideration of the court's legal conclusion that the traffic stop was valid under the Fourth Amendment. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996).

## II.

The Fourth Amendment's protection against unreasonable seizures extends to investigatory stops made by the police. An officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when [he] has a reasonable articulable suspicion that criminal activity is afoot." *Illinois v. Wardlaw*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). When the police rely on an anonymous tip to support reasonable suspicion, the tip "must be accompanied by some corroborative elements that establish [its] reliability." *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004). In other words, "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citation omitted). At bottom, the tip must "be reliable in its assertion of illegality" to protect against mischief and harassment by an "unknown, unaccountable informant." *Id.* at 271-72. We consider the totality of the circumstances in assessing the reliability of an anonymous tip. *See Perkins*, 363 F.3d at 321, 324.

The government argues that three factors provide sufficient corroboration to make the anonymous tip reliable in this case. First, the gov-

ernment contends that the 911 caller provided accurate predictive information about Reaves's route. Specifically, the government says, "By following the suspect's vehicle in transit, the caller provided a continuing stream of predictive information — that is, the caller was able to provide the police with specific, updated information as to where the suspect was going." Appellee's Br. 10. This argument must depend on *Alabama v. White*, 496 U.S. 325 (1990), where an anonymous tipster correctly *predicted* in specific detail the future movements of a woman who, according to the tipster, was in possession of drugs. Under these circumstances the Supreme Court held that it was reasonable for the police, once they corroborated the tipster's predictive information, to credit his allegations of illegal conduct. *Id.* at 332. "[W]hat was important," the Court emphasized, "was the caller's ability to predict respondent's *future behavior*, because it demonstrated inside information — a special familiarity with [the suspect's] affairs." *Id.* The Court continued: "Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." *Id.*

This case is the opposite of *White* because the caller here did not make any predictions whatsoever about the suspect's (Reaves's) future behavior. She simply followed Reaves's Mercedes for a few blocks on public roads, giving the 911 operator a running account of the vehicle's location until she had to leave the trail and head to the market. Although the caller's reports of her contemporaneous observations of Reaves's location were accurate and readily confirmable by the police, they did not show that the caller had reliable information about any criminal activity on Reaves's part. *See J.L.*, 529 U.S. at 272; *White*, 496 U.S. at 332.

Second, the government argues that this case's tip about a drug deal (and gun) gains reliability because the caller was willing to stay on the line with the 911 operator to report Reaves's direction of travel. The caller's running account of Reaves's movement was of considerable assistance to the police in locating and stopping him. And while a tipster's running account from her automobile may contribute to the presence of reasonable suspicion, it may not, by itself, serve to validate the underlying tip here. As the Supreme Court

observed in *J.L.*, an *anonymous* tipster's accurate description of a suspect's location and appearance is "reliable in th[e] limited sense [that it] will help the police correctly identify the person whom the tipster means to accuse," but it "does not show that the tipster has knowledge of . . . criminal activity." 529 U.S. at 272.

The caller here was adamant about remaining anonymous. She twice emphasized her desires in this regard and otherwise made clear that she wanted no further involvement in the matter. By remaining anonymous, the caller did not put herself in a position where her "reputation [could] be assessed" or she could "be held responsible if her allegations [of illegal conduct] turn[ed] out to be fabricated." *Id.* at 270. When an unidentified tipster provides enough information to allow the police to readily trace her identity, thereby subjecting herself to potential scrutiny and responsibility for the allegations, a reasonable officer may conclude that the tipster is credible. *See, e.g.*, *State v. Rutzinski*, 623 N.W.2d 516, 525-26 (Wis. 2001) (unidentified informant, who reported suspect's erratic driving, held to be reliable when informant reported his or her exact location to police dispatcher and pulled to the side of the highway and waited as officer stopped the suspect; "informant . . . exposed him- or herself to being identified," and officer "could reasonably have concluded that the informant knew that he or she potentially could be arrested if the tip proved to be fabricated"). Here, the caller studiously avoided providing information that would have allowed her identity to be traced, and the fact that she conversed with the 911 operator for a few blocks of travel time did not provide the police with sufficient means to test the credibility of her allegation of illegal activity.

Third, the government asserts that the tip was reliable because the caller made a nearly contemporaneous report of her observation of a transaction involving a big sandwich bag and a handgun, which she assumed to be a drug deal. Here, the government relies on *Perkins*, where we concluded that "[t]he tipster's basis of knowledge — a contemporaneous viewing of the suspicious activity — enhanced the tip's reliability." 363 F.3d at 322. This particular conclusion was based on the Supreme Court's longstanding recognition of "the usefulness of verifying an informant's basis of knowledge." *Id.* (citing *J.L.*, 529 U.S. at 270-72). Neither the Supreme Court nor our court, however, has held that an anonymous tipster's unconfirmed, blow-by-blow

assertion of the basis of her knowledge is sufficient by itself to make the tip reliable. Some corroboration is required because a fraudulent tipster can fabricate her basis of knowledge.

*Perkins* is instructive because several corroborating factors, apart from the contemporaneous observation, were present. There, the officer making the automobile stop reasonably assumed that the unidentified caller who gave the tip was, because of her location, a particular informant who had previously provided reliable information about criminal activity in her neighborhood, a high-crime area; the reported incident (pointing rifles) occurred in the yard of a duplex known as a drug house; and when the officer arrived in time to see the suspects leaving in a car, he recognized one as a drug user. *Perkins*, 363 F.3d at 322, 327-28. These corroborating factors led us to conclude that the tip in *Perkins* was reliable.

We recognize here, as we did in *Perkins*, that the caller's disclosure of her basis of knowledge — essentially contemporaneous observation — registers positively on the reliability scale. The problem, however, is that there is not sufficient corroboration to make the tip credible or reliable in its assertion of illegality. As we have already noted, the caller did not predict Reaves's future movements, which might have indicated that she had inside information about his illegal activities; and she insisted on remaining anonymous, which meant that she could not be held accountable for her tip. Moreover, the officer did not know Reaves, and Reaves did not engage in any suspicious activity or commit any traffic violations in the short distance he was followed by the officer. Finally, the stop was not made in a high-crime area, and there is no evidence that the transaction reported by the caller occurred in a high-crime neighborhood. In sum, the circumstances do not permit us to conclude that the tip was sufficiently reliable.

Accordingly, because the officer did not have reasonable suspicion to stop Reaves, the evidence obtained as a result of the stop should not have been admitted at trial. Reaves's conviction is therefore

*VACATED.*